**OMV MEDICAL, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee,**

and

**Choctaw Management Services Enterprise, Defendant–Appellee,**

and

**Professional Performance Development Group, Inc., Defendant–Appellee.**

No. 99–5098.

United States Court of Appeals, Federal Circuit.

July 18, 2000.

Craig Alan Holman, Holland & Knight LLP, of Washington, DC, argued for plaintiff-appellant, OMV Medical, Inc. With him on the brief was Frank K. Peterson.

Marian E. Sullivan, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee, United States. On the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; Harold D. Lester, Jr., Assistant Director; and Todd M. Hughes, Attorney. Of counsel on the brief were Clarence D. Long, III, Department of the Air Force, of Brooks Air Force Base, Texas; and Captain David Whiteford, Department of the Air Force, of Washington, DC.

Glen C. Etelson, Conroy, Ballman & Dameron, Chartered, of Gaithersburg, Maryland, argued for defendant-appellee, Choctaw Management Services Enterprise. With him on the brief was Deborah L. Moran.

Jonathan M. Bailey, Theodore M. Bailey, P.C., of San Antonio, Texas, argued for defendant-appellee, Professional Performance Development Group, Inc.

Before MAYER, Chief Judge, SCHALL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

In this bid protest case, OMV Medical, Inc., protests the award of two contracts related to the Air Force's Family Advocacy Program. The first contract, the FAP East contract, covers the eastern continental United States. The award of that contract was flawed, according to OMV, because the Air Force improperly released price information to one bidder without providing the same information to all bidders. The second contract, the FAP West contract, covers the western continental United States. The award of that contract

was flawed, OMV argues, because the Air Force analyzed the submitted proposals in an arbitrary and irrational manner.

After the contracts were awarded, OMV filed protests at the General Accounting Office (GAO) challenging both awards. The GAO denied the protests. With respect to the FAP East contract, the GAO ruled that regardless of whether the Air Force improperly released price information to fewer than all of the bidders, OMV failed to show that it was prejudiced by the asserted error. With respect to the FAP West contract, the GAO ruled that the administrative record failed to show that the procurement process was flawed.

OMV then filed post-award bid protest actions in the Court of Federal Claims. The court consolidated the two actions, and after further discovery all parties moved for judgment on the administrative records. The court upheld both awards, holding that OMV had not met the standard required to overturn a contract award in a post-award protest action. We affirm the court's order as applied to the FAP East contract, but we vacate its order as applied to the FAP West contract and direct the court to conduct further proceedings with respect to that contract.

I

The Air Force issued requests for proposals (RFPs) for the FAP East and FAP West contracts on July 7, 1998. The contracts were for the provision of clinical social services targeted at preventing and treating domestic abuse. Both contracts were fixed price, indefinite quantity contracts for a base year, with four one-year options.

Clause L–95 of the RFP for each contract was entitled "Evaluation of Compensation for Professional Employees." That clause explained that the proposed compensation levels would be reviewed to ensure that they reflected "a clear understanding of the work to be performed" and indicated "the capability of the proposed compensation structure to obtain and keep suitably qualified personnel to meet mis-

sion objectives." In addition, clause L–95 explained that proposals with compensation levels lower than those of predecessor contractors for the same work would be evaluated "on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees." Leticia Puleo, the Air Force budget analyst who worked on the FAP East and West contracts, evaluated the bids for compliance with clause L–95 by comparing the proposed base salaries in the bids to "minimum salary requirements," which were derived from salary data provided by the incumbent contractors.

Section M of each of the RFPs set forth the factors that would be used to evaluate the proposals. It included technical acceptability, price, and past performance. The RFPs stated that the price proposals would be evaluated for "price realism, reasonableness, and completeness" and that the Air Force would "make a best value award decision," with the best value being the lowest-priced technically acceptable proposal with a low risk rating. Kim Drake performed the price analysis, which included determining the realism of the cost elements of the proposals. In determining the cost realism of the proposals, Ms. Drake compared the salaries set forth in each of the proposals to the salary figures derived by Ms. Puleo and to the salary data for equivalent positions in the Occupational Outlook Handbook published by the Department of Labor's Bureau of Labor Statistics.

A

Prior to the award of the FAP East and West contracts, the Family Advocacy Program for the continental United States was divided into four regions: northeast, southeast, west, and southwest. OMV was the incumbent contractor for the northeast and southeast regions, which were to be combined under the FAP East contract. For both the northeast and the southeast regions, Ms. Puleo asked OMV to provide

her with average current salary figures for each of four labor categories that were to be filled under the contract: Family Advocacy Treatment Manager (FATM), Family Advocacy Outreach Manager (FAOM), Family Advocacy Nurse Specialist (FANS), and Family Advocacy Program Assistant (FAPA). To arrive at a minimum salary requirement for each labor category under the FAP East contract, Ms. Puleo took the lower of the two average annual salary figures for each category and added an acceptable variance of $1000 below that figure.

OMV submitted a price proposal for the FAP East contract, as did six other offerors, including Professional Performance Development Group, Inc. (PPDG). Ms. Puleo compared each offeror's professional compensation plan to the minimum salary figures derived from OMV's salary information. After making that comparison, Ms. Puleo concluded that the initial proposals submitted by PPDG and four other offerors contained professional compensation levels that were too low. Accordingly, on August 25, 1998, the Air Force sent letters to PPDG and the other offerors whose compensation plans were considered inadequate. Two of the bidders, Choctaw Management Services Enterprise and OMV, did not receive such letters because their compensation plans were considered adequate. The letter that was sent to PPDG stated:

> Your proposals ... are not acceptable. The proposed compensation is inadequate to obtain and keep suitably qualified professional employees.

> \* \* \* \* \*

> We have calculated that your proposed salaries for the treatment manager and outreach manager categories for EAST CONUS are at least $1000 below the current average annual salaries. For program assistant, your salaries are approximately ... $4,100 ... below the current range [for the FAP East contract].

In response to the letter, PPDG and the other low offerors revised their bids. After all the offerors submitted their final revised proposals, PPDG was determined to be the lowest bidder and was awarded the contract.

### B

Like the FAP East contract, the FAP West contract combined two prior regions, the west and the southwest regions. In order to determine the minimum salary requirements for the FAP West contract, Ms. Puleo obtained salary information from the two incumbent contractors, Saratoga Medical Center, Inc., (for the southwest region) and Chesapeake Center, Inc., (for the west region). Saratoga first provided Ms. Puleo with average hourly salary figures for the FATM, FAOM, FANS, and FAPA positions, from which she calculated average annual salaries for those positions by multiplying the hourly salary rates by 2000. Because she discovered that different contractors were paying their employees for a different number of hours of work per year, Ms. Puleo returned to Saratoga several months later and asked Saratoga to provide average annual salaries for the four positions in question. Saratoga provided her with the average annual salaries for those positions and calculated new hourly rates for those positions by dividing the average annual salaries by 2080 hours. Ms. Puleo then used those calculated hourly rates to derive the minimum acceptable salary levels for the FAP West contract.

Chesapeake did not provide its actual salary levels, but instead gave Ms. Puleo a range of hourly salary rates for the four groups of employees and stated that "our experience shows that it will require at least the following rate structure to support the contract, given some of the hard-to-fill locations." To convert those hourly rates into annual rates, Ms. Puleo took the midpoint of each range and multiplied it by 1848, the number of hours of work for which the government would reimburse

the contractor. She testified that she used the 1848 hour figure because she did not have information about the number of hours per year for which Chesapeake paid its employees. As in the case of the FAP East contract, Ms. Puleo derived the minimum acceptable salary levels for the FAP West contract by choosing the lower of the two sets of average salaries for each position and then adding an acceptable variance of $1000 per year. Based on Ms. Puleo's calculations, all of the bidders satisfied the minimum acceptable salary requirements for the FAP West contract. Choctaw submitted the lowest bid for that contract, Saratoga submitted the second lowest bid, and OMV submitted the third lowest bid. Choctaw was awarded the contract.

## II

With respect to the FAP East contract, OMV contends that the letter advising PPDG that its compensation plan was inadequate effectively told PPDG what the Air Force's minimum salary requirements were for the contract. That kind of information can be provided to bidders, OMV argues, but only if it is shared with all those bidding on the contract. OMV also argues that the letter improperly revealed OMV's proprietary salary information to its competitor, PPDG.

The trial court rejected OMV's arguments. It first held that the letter to PPDG did not reveal OMV's proprietary salary data. The letter merely dealt in approximations, the court held, and it did not disclose what OMV, as the incumbent contractor, was actually paying its employees. The trial court also held that section 15.306(e)(3) of the Federal Acquisition Regulation authorized the Air Force to inform particular bidders that their professional compensation levels were unacceptable. That provision states that government personnel involved in an acquisition shall not engage in conduct that

> [r]eveals an offerors [sic] price without that offeror's permission. However, the contracting officer may inform an offeror that its price is considered by the

Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion. It is also permissible, at the Government's discretion, to indicate to all offerors the cost or price that the Government's price analysis, market research, and other reviews have identified as reasonable.

48 C.F.R. § 15.306(e)(3).

OMV argues that the last sentence of the regulation means that the government may elect to indicate to offerors what it regards as a reasonable price, but that if it does so, it must share that information with all offerors. The letter to PPDG, OMV argues, effectively indicated what the government regarded as a reasonable price. That information, according to OMV, therefore should have been shared with all the offerors. The government and PPDG respond that this case is controlled not by the last sentence of the regulation, but by the immediately preceding sentence, which authorizes the government to advise an offeror that its price is considered too low and to "reveal the results of the analysis supporting that conclusion." According to the government and PPDG, the letter to PPDG did no more than advise PPDG that the compensation component of its price was too low and provide PPDG with the results of the analysis that led it to that conclusion, as the regulation permits.

■ We reject OMV's argument that the letter to PPDG improperly revealed OMV's proprietary information. The letter set forth the approximate amount by which PPDG's proposed salary rates were below "current average annual salaries," not OMV's actual salary rates. Moreover, OMV provided the average salary rates to the government without any claim that the information was proprietary and should be protected. It was therefore not error for the government to use those average current salary rates to advise other bidders roughly how much below current salary rates their proposed rates were.

With respect to OMV's argument that it was error to provide the salary information to PPDG without providing the same information to all the bidders, it is not necessary for us to resolve that question. Even if the government's action constituted error, we agree with the conclusion reached by the GAO that OMV has not shown it was prejudiced by the error. That is, OMV has not met its burden of showing that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that [it] would have been awarded the contract." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996); *see also Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

OMV argues that it was prejudiced by the disclosure of information to PPDG because, if it had received the pricing data that the Air Force gave to PPDG, it could have altered its proposal and submitted a bid lower than the one PPDG submitted. That argument fails, however, no matter how the alleged error is viewed. If the government had avoided the asserted error by not sending the letter at all, and if PPDG as a consequence had not increased its compensation package, PPDG would have been disqualified or at minimum its bid would have been subjected to special scrutiny. That, however, would not have benefited OMV, because Choctaw, which was the second lowest bidder and did not receive a letter like the one sent to PPDG, would have been awarded the contract if PPDG had been eliminated.

On the other hand, if the government had provided the information in the PPDG letter to all the offerors, OMV would not have been materially better off. OMV was fully aware of its own salary information, and it knew from clause L–95 that the government would be using its salary information as a benchmark to evaluate the offerors' bids. The letter did not reveal any other information that would be useful to PPDG in revising its bid but that was not known by OMV, such as the fact that the government was prepared to accept bids that were up to $1000 less than the prevailing salary levels paid by OMV. Disclosure of the information in the letter therefore would not have told OMV anything it did not already know.

In the trial court, OMV submitted a declaration of its principal, Olga James, in which she stated that she did not know how the Air Force was determining minimum acceptable salary estimates and that if OMV had had the information that was revealed to PPDG it "would have reduced its proposed compensation packages and likely submitted a proposal at or below Choctaw's award price." That argument is unpersuasive because it is premised on the notion that the information in the letter to PPDG was inconsistent with the caution in clause L–95 that "lowered compensation [from levels in predecessor contracts] for essentially the same professional work may indicate a lack of sound management judgment and understanding of the requirement." In fact, the information in the PPDG letter, advising PPDG that its compensation levels were inadequate because they were below current levels of compensation for each of the positions under the contract, is entirely consistent with the caution given in clause L–95. Ms. James' declaration therefore does not set forth any facts on which a finding of prejudice could be based.

In sum, even if the Air Force erred by notifying PPDG and four other offerors that their professional compensation levels were inadequate and failing to provide similar information to the remaining bidders, OMV was not prejudiced by the error. We therefore uphold the order of the trial court rejecting OMV's protest with respect to the FAP East contract.

## III

With respect to the FAP West contract, OMV argued in the trial court that Ms. Puleo's method of calculating the minimum acceptable salary levels was irrational and

that as a result the requirements for satisfying clause L–95 were set too low. Had the requirements been set higher, OMV argues, the low bidders, Choctaw and Saratoga, would have been disqualified and OMV, the third lowest bidder, would have been awarded the contract.

■ Under 28 U.S.C. § 1491(b)(4), bid protest actions are reviewed under the "arbitrary and capricious" standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000); *John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1299 (Fed.Cir.1999). That standard requires a reviewing court to sustain the agency action in question if the action "evinc[es] rational reasoning and consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058. Thus, in order to overturn the contract award, OMV must show that the Air Force reached its decision with respect to the FAP West contract award in an irrational manner.

The trial court agreed with OMV that "Ms. Puleo's method of calculating the minimums is indeed perplexing." But the court ruled that it was not necessary that the minimums be calculated in a rational way, as long as they were not so unreasonably low as to render the Air Force's professional compensation analysis and subsequent award arbitrary or inconsistent with the RFP. The trial court concluded that the minimum acceptable salary requirements were not unreasonably low, because they were generally consistent with the median salaries in the Bureau of Labor Statistics' 1998–1999 Occupational Outlook Handbook.

■ We disagree with the trial court's analysis in one important respect. The Air Force's determination of minimum acceptable salary requirements cannot be justified on the ground that they were generally consistent with salaries set forth in the Occupational Outlook Handbook, because the Air Force did not use the Occupational Outlook Handbook for that purpose. As provided in the RFPs, there

were two components to the Air Force's review of the offerors' compensation packages: (1) a determination of whether each offeror's compensation package was generally consistent with the salaries being paid by the incumbent contractor; and (2) a determination of whether each offeror's compensation plan was realistic, *i.e.,* whether it indicated that the offeror understood the scope of the work. The first component was based on Ms. Puleo's derivation of minimum adequate salaries and was designed to ensure that the incoming contractor would not experience a large turnover in the program workforce because of a significant reduction in salary levels. The second component was based on Ms. Drake's analysis, in which she used the Occupational Outlook Handbook to determine the general level of compensation for equivalent positions.

Because the Air Force designed the two components to serve different purposes and arranged for them to be calculated differently, the method the agency used to address one component is not interchangeable with the method used to address the other. Thus, an offeror's salary levels could be consistent with the Occupational Outlook Handbook, indicating that the offeror had a reasonably clear idea of the level of compensation it would have to pay in order to obtain employees to perform the work of the contract, yet those salary levels might still be sufficiently far below the incumbent's salary levels that the incoming contractor would be likely to experience an unacceptably large staff turnover and loss of program continuity.

The government and Choctaw argue that clause L–95 did not require the calculation of minimum adequate salaries, and certainly did not require that those salaries be calculated in the way Ms. Puleo set out to calculate them. In addition, the government argues that the contracting officer was not required to abide by the results of Ms. Puleo's analysis, but instead could have relied entirely on the salary

figures from the Occupational Outlook Handbook.

It is true that clause L–95 did not require the preparation of minimum acceptable salary levels and that nothing prohibited the Air Force from awarding the contract to an offeror with salary levels lower than the minimum salary levels derived by Ms. Puleo. The record, however, makes clear that the contracting officer directed Ms. Puleo to prepare the minimum salary figures and that the contracting officer relied on those figures in analyzing the offerors' bids and determining which offeror would be awarded the FAP West contract. Whatever the contracting officer might have done in theory, the evidence before the court was that he relied on Ms. Puleo's calculations and that the minimum acceptable salary figures played a significant role in his procurement decision. Any flaw in those figures cannot be disregarded simply because the contracting officer was not legally obligated to award the contract in accordance with those figures and could lawfully have awarded the contract on a different basis. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ("we may not supply a reasoned basis for the agency's action that the agency itself has not given"); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ("[A] reviewing court in dealing with·a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.").

For that reason, we disagree with the trial court's conclusion that it is irrelevant whether Ms. Puleo followed a rational mode of analysis in comparing the offerors' salary levels with those of the incumbent. On remand, the trial court must determine whether Ms. Puleo conducted the salary level comparisons in an irrational manner and, if so, whether the error on her part was prejudicial to OMV.

Of course, in order for Ms. Puleo's analysis to be rational, it is not necessary that it be performed with impeccable rigor. The task of determining the minimum acceptable salary levels for the various positions was necessarily an exercise in approximation, and any assessment of the rationality of Ms. Puleo's calculations must take into account the limited amount of information available to her. Nonetheless, if her calculations were tainted by irrational assumptions or critical miscalculations, they may have been so useless as a basis for determining the minimum acceptable salary levels that her calculations tainted the bidding process. The question whether Ms. Puleo's method of calculating the minimum acceptable salary levels was irrational is an intensely factual inquiry that is best addressed in the first instance by the trial court.

Choctaw and the government argue that even if the Air Force made an error in the method by which the procurement decision was made, the error did not prejudice OMV. We are not able to make a determination of prejudice at this juncture, however. Whether OMV can demonstrate prejudice depends on the nature of the error, if any, that the trial court finds to have been made in this case, *i.e.,* in what respects Ms. Puleo's analysis of the minimum acceptable salary levels was flawed. We therefore remand to the Court of Federal Claims for further proceedings consistent with this opinion.

Each party shall bear its own costs for this appeal.

*AFFIRMED IN PART, VACATED IN PART, and REMANDED.*