UNITED PAYORS & UNITED PRO-
VIDERS HEALTH SERVICES,
INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

CRAssociates, Inc., Defendant–Intervenor.

No. 02–1135C.

United States Court of Federal Claims.

Filed Under Seal: Dec. 19, 2002.

Reissued as Redacted: Feb. 27, 2003 [1].

---

1. This opinion was originally issued and filed under seal on December 19, 2002 pursuant to this Court's September 19, 2002 protective order. The parties were given an opportunity to advise the Court regarding any privileged and/or protected portions of this opinion that should be redacted prior to publication. Only the defendant-intervenor submitted proposed redactions. After careful consideration, the Court has incorporated some of the redactions proposed by the defendant-intervenor, while not adopting others because, in the Court's view, the information was neither privileged nor protected. Redactions are indicated by three asterisks (" * * * "). Additionally, a few minor editing changes have been made to this opinion, none of which affect the substance of this Court's decision. Judgment has been entered for the plaintiff.

Kenneth B. Weckstein, Epstein Becker & Green, P.C., Washington, D.C., for plaintiff. Raymond Fioravanti, Epstein Becker & Green, P.C., Washington, D.C., of counsel.

David R. Feniger, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, and Todd M. Hughes, Assistant Director, for defendant.

Devon E. Hewitt, Shaw Pittman LLP, McLean, VA, for defendant-intervenor. Daniel S. Herzfeld, Shaw Pittman LLP, McLean, VA, of counsel.

## OPINION

MARGOLIS, Senior Judge.

This post-award bid protest brought by United Payors and United Providers Health Services, Inc. ("UP & UP") against the United States, acting through the United States Department of Health and Human Services ("HHS"), is before the Court on plaintiff's motion for injunctive relief, defendant's partial motion to dismiss, and defendant's motion for judgment upon the administrative record. After careful consideration of the briefs and the oral argument, plaintiff's motion for injunctive relief is granted. Defendant's partial motion to dismiss and motion for judgment upon the administrative record are denied.

## FACTS

This dispute arises out of a contract that the HHS awarded to CRAssociates ("CRA") in response to request for proposal number 282–99–0001 ("the solicitation"). HHS originally issued the solicitation in August 1998. After a successful bid protest by CRA, the solicitation was reissued in August 2000.

### 1. Solicitation

The purpose of the solicitation was to request proposals for a cost-reimbursement contract in which the awardee would provide health care services to detainees of the Immigration and Naturalization Service ("INS") for a period of five years. The contractor would be required to perform various and distinct tasks related to the detainees' health care service. Task I requires the contractor to provide certain medical staffing for various INS medical facilities. Task II specifies that the contractor would provide on-site medical and support services to augment existing resources at designated INS facilities. Task III requires the contractor to establish an integrated health care system for the detainees, and is broken into three sub-parts: Task IIIA states that the contractor will establish a preferred provider network; Task IIIB requires that the contractor process claims for all payments to providers and institutions that provide medical services to the detainees; and Task IIIC mandates the construction of a system by which the contractor can conduct utilization and quality management reviews. Task IV is a pass-through requirement in which the contractor must pay all claims for medical support services rendered to the detainees housed throughout the country that were incurred pursuant to other provisions in the contract.

The solicitation outlines the criteria to be used in evaluating the proposals. The proposals would first be evaluated on the offeror's: (1) technical approach; (2) financial and management capability; and (3) past performance. "[I]f two or more proposers' acceptable proposals [were found to be] essentially equal, then business management competence and total cost/price [would] become the final determining factor. Furthermore, cost/prices [would] be evaluated on the basis of cost realism which is defined as the offeror's ability to project costs which are reasonable and indicate that the offeror understands the nature and the extent of the work [that was to be] performed." (Admin. R., at 77.)

### 2. Proposals

CRA and UP & UP [2] were the only two offerors in the competitive range. After performing several rounds of technical evaluations, HHS determined that the proposals by CRA and UP & UP were technically equivalent, and that the final determining factor would therefore be price.[3]

In its initial proposal, CRA estimated that the total cost to the Government for full performance of the contract by CRA would be $221,541,235. HHS later revised that estimate to $* * *.[4] UP & UP estimated that the total cost to the Government for full performance of the contract by UP & UP would be $227,532,203. Therefore, UP & UP's proposal estimated costs that were $* * * higher than those estimated by CRA, as revised by HHS.

UP & UP and CRA used two distinctly different methods to arrive at their respective proposal estimates, especially with regard to claims processing. CRA proposed to subcontract the claims processing work to * * *, and charge the Government a flat rate of $* * * per claim processed. CRA premised its entire proposal on its assumption that "[t]he number of claims to be processed annually equals [* * *]." (Admin. R., at 323.) CRA's proposal contained a line item for "[* * *] Claims Office" for a total of $* * *, calculated by multiplying the $* * * per-claim rate by * * * claims per year by five years. In addition to the $* * * * * * Claims Office charge, CRA proposed five-year totals of $* * * for other direct costs ("ODCs") and $* * * for "[* * *] Utilization Management," expressly stating that each proposed amount was for capacity of "up to

[* * *] claims." (Admin. R., at 344.) CRA also proposed to add * * *% of total costs for general and administrative ("G & A") expenses, and fees of * * *% for the first three years, and * * *% for the fourth and fifth years. CRA's proposal did not address how its estimated costs would change if the number of claims exceeded the assumed * * * per year.

UP & UP did not propose to charge HHS for claims processing on a per-claim basis. Instead, it proposed a number of employees to perform the work, and included the wage rates for such employees in its proposed cost figure. UP & UP had been the contractor on the predecessor contract, and based its proposal not on the expected number of claims, but on past experience in processing the claims in question.

### 3. *Number of Claims*

The central issue in this case revolves around HHS's failure to estimate, in the solicitation, the number of claims that would be processed under this contract. Several times during the negotiation process, HHS was formally asked the estimated number of claims that were to be processed. Each time, HHS responded with vague answers. When asked formally and directly "what number of claims should be used in preparing the cost proposal," HHS responded by stating that "[t]here is no historical data available at this time. The number of claims depends on the health of the detained population in future years. This is an 'unknown.'" (Admin. R., at 250.)

---

2. At some point early in the negotiations, PHP Healthcare changed its name to UP & UP. This Court will use the name "UP & UP" to refer to both the present entity named UP & UP and to its predecessor, PHP Healthcare.

3. UP & UP argues that HHS failed to adequately evaluate the comparative technical abilities and the business management competence of each of the competitors, and that, consequently, the award to CRA was improper. The Court need not reach those arguments, as it is ruling in favor of UP & UP on different grounds.

4. HHS revised the estimate because CRA and UP & UP had calculated the labor costs based on a different number of hours worked per year by

full-time employees. UP & UP had used 2,080 hours per year for each full-time employee as the basis for its labor costs. CRA had calculated its labor costs based on 1,840 hours per year for each full-time employee. HHS, therefore, revised CRA's estimate to reflect heightened labor costs based on 2,080 hour years. This was not actually noticed by HHS and revised until after the GAO proceeding contesting the award to CRA had begun. CRA continues to argue that this revision was unnecessary and incorrect and that, therefore, when evaluating the cost, the original estimate should be used. The Government, however, is not contesting that the adjustment should have been made at the time of the cost realism analysis.

Although CRA does not acknowledge that this exchange occurred, the contracting officer made handwritten notations in the administrative record that suggest that he had informed CRA that the number of claims to be expected would be approximately 30,000 per year. (Admin. R., at 253, 260.) In any case, CRA acknowledges that an offeror

> could derive an approximate number of total claims by extrapolating the information that was provided by HHS... HHS indicated that approximately 6700 claims had been processed during fiscal year 1998 from the [INS Service Processing Centers ("SPSs")] and [Contact Detention Services ("CDCs")]. The Solicitation included a table which identified the approximate number of detainees at the SPCs, CDCs and jails in the fiscal year 1998 and for the subsequent five fiscal years, up until 2003. (Admin. R., at 135.) Using the claims figure of 6700 for SPCs and CDCs and the population figures for SPCs and CDCs, an offeror could project that the contractor would process about 1.5 claims per detainee. In order to extrapolate this figure into an average annual number of claims figure, an offeror could multiply 1.5 by the average annual population of detainees expected under the contract. HHS indicated that they expected to award the contract by January 1, 1999. (Admin. R., at 6.) HHS anticipated that the average total detainee population at the SPCs, CDCs and the jails for fiscal years 1999—2003 would be 19,600. Multiplying this average population figure by the average claim per detainee figure of 1.5 results in an annual average number of claims figure of 29,400. Thus, to the extent that HHS provided some guidance in the Solicitation, that guidance suggest that the contractor would, on average, process about 30,000 claims annually.

Inter.'s Mem. in Supp. of Def.'s Opp'n to UP & UP's Mot. for Prelim. Inj. & Mot. for Summ. J. on the Admin. R., at 12–13 (footnotes omitted).

Both UP & UP and HHS had more definite historical resources upon which they could rely to determine the estimated number of claims to be processed under the contract. UP & UP had performed the predecessor contract, and was, in fact, still performing it and, therefore, still processing those claims at the time that the contract at issue was awarded. UP & UP, therefore, had access to the claims and knew the number of claims during the entire solicitation period. The number of claims that UP & UP alleges had been submitted during the previous year, however, is not as clear to even UP & UP as one would assume. In its technical proposal, UP & UP estimated that the number of claims would be between 30,000 and 36,000 annually. UP & UP now argues that the true number of claims would be around 84,000. UP & UP explains that the 30,000 to 36,000 number incorporated both individual and bundled claims, and that if the bundled claims were to be unbundled, the number of individual claims would become 84,000. UP & UP has submitted an affidavit to support that contention.

"Under its predecessor contract, UP & UP did not bill the government for claims processing services on a 'per claim' basis. Rather, it simply hired employees to perform the function and charged the resulting labor costs against the contract." (Proposed Add'l Facts, at ¶ 15.) Therefore, there was no reason for UP & UP to keep an accurate account of how many total claims were processed. UP & UP claims, however, that, as CRA's proposal allows CRA to charge a flat fee per claim processed, CRA would be able to unbundle the claims that would have been bundled under UP & UP's contract, and charge per claim. UP & UP asserts that, therefore, the proper number of claims that should have been used in the evaluation process was 84,000, not 30,000. CRA counters that, "[l]ike UP & UP, CRA treats a bulk claim as one claim and only charges the Government the cost associated with processing that one claim rather than those costs associated with processing each individual claim set forth therein." (Inter.'s Mem. in Supp. of Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for J. on the Admin. R., at 10.) CRA submitted a declaration by the project manager in charge of this contract in which he explains that bulk claims are treated as one claim by CRA.

### 4. Cost Realism Analysis and Award

Section M.2 of the solicitation specifies that, before the award could be made, the cost/prices would be subject to a cost realism analysis. The solicitation defined a cost realism analysis as one which evaluated "the offeror's ability to project costs which are reasonable and indicate that the offeror understands the nature and extent of the work to be performed." (Admin. R., at 246.) Defendant maintains that the Government conducted a proper cost realism analysis, thereby determining that CRA could perform at a lower cost. Plaintiff claims that the cost realism analysis that was performed was improper, and that the award was, therefore, arbitrary.

Whether a proper cost realism analysis was conducted is a major issue in this case. HHS claims that the cost realism analysis conducted by Kevin McGowan, an HHS contract specialist, was proper. When testifying at the GAO hearing, McGowan stated that, after he looked at a "little packet telling him what cost realism" was, he determined that the purpose of a cost realism analysis was "to make sure that the costs [were] realistic." (Admin. R., at 497.) Therefore, he went through and compared the costs for (1) direct labor, (2) fringe benefits for the direct labor, (3) ODCs, (4) G & A, (5) fee, (6) claims payment, and (7) fee on the claims payment. Where he saw differences between the rates, he used common sense to determine whether it was reasonable. For example, he noticed that CRA had proposed higher direct costs, and he "interpreted that as reasonable based on the fact that the incoming contract [wouldn't] have all of the equipment and material already set up." *Id.* He was also concerned that UP & UP's G & A rate was too low and he did not want to "get in a situation where you can harm a company." *Id.* McGowan admitted at the GAO hearing that he did not notice at that time that the numbers for labor costs were different, and that was a flaw in his analysis.

At the time that the cost analysis was conducted, HHS knew, or had the ability to ascertain, how many claims had been processed in the previous year under UP & UP's predecessor contract. HHS knew that, disregarding the 84,000 issue, approximately 30,000 claims existed per year. HHS had, therefore, been expecting 30,000 claims to be processed annually under the contract. It was clearly stated in several places in CRA's proposal that the proposal was based on * * * claims. At no point during the analysis did HHS question the accuracy of CRA's assumption that there would be no more than * * * claims per year, nor did HHS adjust CRA's estimated costs to reflect HHS's expectation that 30,000 claims would be processed each year. HHS simply determined that CRA was the offeror with the lowest bid and, therefore, awarded the five-year contract to CRA. Performance on the contract began in August of 2002 and was set to run until 2007.

### 5. Bid Protest

UP & UP filed a protest against the award to CRA with the U.S. General Accounting Office ("GAO"). UP & UP claimed that HHS had failed to perform a proper cost realism analysis, and that, had it done so, it would have found that CRA's proposed costs were actually greater than UP & UP's proposed costs. UP & UP claims that CRA should not have been awarded the contract because (1) HHS wrongly concluded that the proposals were technically equivalent, and (2) HHS failed to adjust the proposals during the cost realism analysis to reflect inconsistencies between them. The GAO did not address the merits of the claims that HHS failed to perform a proper cost realism analysis, but denied the protest on June 26, 2002.

On September 6, 2002, UP & UP filed a complaint against the United States in this court protesting the award. UP & UP renews the arguments that it made during the GAO proceeding. In particular, its main claim is that HHS failed to adjust the proposals during the cost analysis to reflect the inconsistencies between them. It argues that HHS knew that at least 30,000, and as many as 84,000 claims, were actually going to be processed per year. By evaluating the proposal without adjusting from the * * *, UP & UP asserts that, if the number of claims ended up being more than * * *, the Government would be responsible for the

additional cost of $* * * per claim and for increased ODCs, * * * Utilization Management costs, G & A expenses, and fees.

UP & UP claims that, as there is no way of determining exactly how much higher CRA's estimate would have been had they been assuming a higher number of claims, the only sensible way of comparing would be to add an additional * * *% of all of the amounts in question to account for the at least * * * additional claims. If the Court were to evaluate the proposal in this manner, UP & UP claims that it would have submitted the lower bid. HHS contends that this method would not provide accurate results. Although HHS does not propose an alternative method, it claims that the method proposed by UP & UP would lead to inaccurate results because it fails to take into account the possibility that economies of scale would lower the final estimate. UP & UP asserts that HHS's failure to adjust the estimate to reflect the differences in technique, as even HHS acknowledges it should have done to some extent, renders the award arbitrary.

### 6. Termination for Convenience

On September 24, 2002, HHS sent a letter notifying CRA that, effective December 31, 2002, its contract would be partially terminated for convenience. Specifically, HHS stated that it intended to terminate Task IIIA, Task IIIB, Task IIIC, and all portions of Task IV except those which pertain to Task II. On October 4, 2002, HHS sent another letter to CRA, revising the partial termination notice to reinstate the Task IIIA work. Task IIIA tasks are unrelated to claims processing.

HHS has submitted a partial motion to dismiss claiming that, "by issuing this termination for convenience, HHS effectively terminated the vast majority of CRA's contract—thereby depriving this Court of jurisdiction over the terminated portion of the contract." (Def.'s Resp. to Pl.'s Mot. for Inj. Relief & Def.'s Partial Mot. to Dismiss & Mot. for J. on the Admin. R., at 8.) UP & UP maintains that the case is not moot. UP & UP claims that this Court still has jurisdiction for several reasons: (1) It is only a "partial termination," and "as long as

any portion of the contract awarded to CRA under the subject solicitation remains, there is a 'contract' over which the Court has jurisdiction"; (2) No part of the contract has been terminated; there is simply a notice of an intent to terminate in the future. Therefore, HHS is not obligated to terminate anything, as evidenced by the fact that the termination notice has already been partially revoked; and (3) HHS has improperly attempted to perform the work through another Government agency. (Pl.'s Reply to Def.'s & Inter.'s Opp'n to Pl.'s Mot. for Inj. Relief, & Pl.'s Opp'n to Def.'s and Inter.'s Mot for J. on Admin. R., at 17–19.)

### DISCUSSION

### 1. Jurisdiction and Standard of Review

This Court has jurisdiction to review post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (1994), as amended by the Administrative Dispute Resolution Act of 1996. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1330 (Fed.Cir.2001). To afford relief in bid protest cases, this Court "may award any relief that [it] considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

Under the Administrative Dispute Resolution Act, the Court reviews bid protest cases " 'pursuant to the standards set forth in section 706 of title 5' of the APA [Administrative Procedures Act]." *Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1332 (quoting 28 U.S.C. § 1491(b)(4)). In relevant part, section 706 of title 5 of the APA states: "The reviewing court shall—. . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;. . . [or] (D) without observance of procedure required by law. . . ." *Id.* (citing 5. U.S.C. § 706).

Under the APA standards, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id.* (citations omitted). When a challenge is brought on the first ground, the

"disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Id.* at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). "[T]he courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)). "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Id.* at 1332–33. "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973)).

■ A protester's showing that a contracting officer's award decision was arbitrary and capricious, or that it was in violation of applicable law, is not sufficient by itself to set aside an award. The protester must also show that it was prejudiced by the error in the procurement process. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365,- 1367 (Fed.Cir.1999) (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir. 1996)). "'To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.'" *Id.* (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). "Rather, the protester must show 'that there was a *substantial chance* it would have received the contract award but for that error.'" *Id.* (quoting *Statistica*, 102 F.3d at 1582) (emphasis added).

## 2. *Merits*

■ Plaintiff alleges that, in reviewing CRA's proposal, HHS failed to perform a proper cost realism analysis as required by the Federal Acquisition Regulation ("FAR"), which states in relevant part:

When contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's ability to perform the contract.... The contracting officer shall document the cost or price evaluation.

48 C.F.R. § 15.305(a)(1).

The FAR defines "cost realism analysis" as:

[T]he process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

48 C.F.R. § 15.404–1(d)(1).

With respect to cost-reimbursable procurements, the FAR requires the contracting officer, in essence, to regard a contractor's proposal as a starting point from which, by performing a cost realism analysis, a realistic "probable cost" can be estimated. Regarding this estimated probable cost, the FAR states:

The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value.

48 C.F.R. § 15.404–1(d)(2)(i).

In reviewing HHS's cost realism analysis, the Court defers to those agency conclusions that are rational and based on reasoned judgment. "Because the agency is in the best position to make this cost realism determination, our review is limited to determining whether its cost evaluation was reasonably based and not arbitrary." *In re EER Sys., Inc.*, 2002 WL 31429137, at *9 (Comp.Gen. Oct.23, 2002).[5] To determine whether the

---

**5.** Although decisions of the Comptroller General are not binding on this Court, "the court may accord deference to them in recognition of the expertise and role of the General Accounting

contracting officer's cost evaluation of CRA's proposal was reasonably based, this Court examines the administrative record for documentation supporting the cost analysis conclusions.

The record shows that HHS requested estimated costs for claims processing under Task IIIB of its solicitation, but did not provide an estimated number of claims to be processed annually by the successful bidder. During the solicitation period, when asked the number of claims bidders should use in calculating proposed costs under Task IIIB, HHS stated, "There is no historical data available at this time." (Admin. R., at 250.) CRA submitted its proposal, therefore, based on its assumption that * * * claims would be processed annually. In addition to the $* * *-per-claim amount proposed, CRA's proposed amounts for * * * Utilization Management costs, ODCs, G & A expenses, and fees were all based on an assumed annual claims processing volume of * * * claims. CRA did not indicate in its cost proposal, nor did HHS inquire, how claims processing volumes above * * * annually would affect * * * Utilization Management costs and ODCs.

Based on an ambiguity in the solicitation as to whether a bundled claim would be treated as a single claim or multiple claims, UP & UP argues that the available historical information shows that the annual claims processing volume was as much as 84,000. While both defendant and CRA dispute UP & UP's "bundled claim" theory, all of the parties agree that HHS expected, based on available historical information, that at least 30,000 claims would be processed annually. Nevertheless, HHS accepted CRA's assumed claims processing volume of * * * without question, and never attempted to adjust CRA's estimated costs to reflect the more realistic 30,000 annual claims for the purpose of proposal evaluation. Clearly, HHS lacked any rational basis to evaluate CRA's proposal based on CRA's arbitrarily selected * * * annual claims assumption, in view of the fact

Office in the resolution of contested procurement decisions." *Computer Scis. Corp. v. United*

that CRA's proposed costs were so closely tied to that assumed volume.

During oral argument, defendant all but conceded that HHS was arbitrary and capricious when it failed to adjust CRA's proposed costs for its unrealistically low assumed claims processing volume as part of HHS's cost realism analysis. The Court is mindful, however, that "in order for [HHS's] analysis to be rational, it is not necessary that it be performed with impeccable rigor." *OMV Medical, Inc. v. United States*, 219 F.3d 1337, 1344 (Fed.Cir.2000). The cost realism analysis must, however, make a good faith effort to consider material facts that a reasonably prudent person would consider relevant to the procurement decision, and cannot be "tainted by irrational assumptions or critical miscalculations." *Id.* Because procurement decisions must usually be made having less than perfect information, any assessment of the rationality of HHS's cost realism analysis "must take into account the ... amount of information available...." *Id.* In performing a cost realism analysis, "an agency need not verify each and every cost item, it must take reasonable, documented, steps to assess what costs are likely to be incurred under each offeror's technical approach, assuming reasonable economy and efficiency." *In re National City Bank of Indiana*, 2002 WL 31643757, at *7 (Comp.Gen. August 7, 2002). Here, HHS ignored information, available before its award decision, that at least 30,000 claims would be processed annually. Instead, HHS inexplicably accepted CRA's "irrational assumption" that the annual number of claims processed would be * * *.

The facts in *In re Priority One Serv., Inc.*, B–288836, 2002 CPD ¶ 79, 2001 WL 1872433 (December 17, 2001), are analogous to the instant case. There, the Comptroller General sustained the protest where the agency failed to adjust the protester's estimated ODCs downward to reflect an adjustment to the protester's erroneously high assumptions regarding that cost element. In so doing, the Comptroller General explained:

*States,* 51 Fed.Cl. 297, 308 n. 14 (2002).

[T]he agency's cost analysis simply compared the individual cost elements of each proposal to the elements in the other proposals and to the independent government cost estimate. No probable cost adjustments, either upwards or downwards, as contemplated by FAR § 15.404–1(d)(2), were made, even where Priority One's ODCs were found to be significantly overstated and unrealistic. While the agency claims that Priority One's ODC costs reflected a misunderstanding of the requirements, it was required in such circumstances to downwardly adjust Priority One's ODC costs in the cost-realism analysis.

*Id.*

Similarly, in the instant case, HHS knew that CRA's assumed annual claims processing volume was understated by approximately * * * claims. HHS also knew that CRA's proposed costs associated with, or dependent upon, the assumed claims processing volume were understated by some significant, albeit unknown, amount. The record does not contain adequate support for the HHS's acceptance of CRA's assumed annual claims volume. "That defect is critical here, because the selection decision was entirely premised on [CRA's] evaluated cost advantage." *In re National City,* 2002 WL 31643757, at *9.

Applying the tests articulated in *Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1333, this Court finds both that "the procurement official's decision lacked a rational basis" and "the procurement procedure involved a violation of regulation or procedure." HHS awarded the contract at issue based on data it knew was flawed, with no "coherent and reasonable explanation of its exercise of discretion" in the administrative record. *Id.* As discussed above, HHS also failed to follow procedures articulated in the FAR designed to provide the contracting officer comparable data on which to base the procurement decision.

Defendant's principal argument, however, is that even assuming that HHS's award decision was arbitrary and capricious, or involved a violation of applicable statute or regulation, plaintiff has not shown that it was prejudiced by the * * * difference between CRA's assumed annual claim volume and the more realistic historical volume. Defendant asserts that correcting this error would result in only a $* * * increase in CRA's estimated costs, based on CRA's proposed per-claim cost of $* * *.

Plaintiff contends that, given an assumed annual volume of 30,000 claims, UP & UP's proposed costs were less than CRA's, assuming that CRA's proposed amounts for * * * Utilization Management and ODCs were increased by * * * %-the pro rata amount corresponding to the increase of CRA's assumed annual claims volume from * * * to 30,000 claims-and assuming that CRA's G & A and fee rates were applied to that increase. Defendant counters that plaintiff's assumption that CRA's * * * Utilization Management costs and ODCs would increase on a pro rata basis is unrealistic, because the assumption fails to take into account that CRA would enjoy certain economies of scale from the larger claims processing volume. In short, defendant argues that UP & UP cannot demonstrate that adjusting CRA's proposal to reflect a 30,000 annual claims volume would result in sufficient increases in CRA's proposed costs to affect the outcome of HHS's award decision.

Defendant is correct that plaintiff's assumptions regarding the elasticity of CRA's proposed * * * Utilization Management costs and ODCs are pure speculation. By the same token, defendant's attempt to discredit plaintiff's assumptions is equally speculative. If HHS had conducted a proper cost realism analysis, it would have probably needed to ascertain the cost impact, and possibly the technical impact, of a * * *% increase in CRA's assumed annual claims processing volume. Nothing in CRA's proposal, or anywhere else in the administrative record, provides guidance for calculating such a cost impact. Indeed, the record does not indicate whether CRA has the capacity to process more than * * * claims annually. The Court will not attempt to speculate the amount by which CRA's proposed costs would increase given an assumed annual claims processing volume of 30,000 claims.

Plaintiff has not conclusively proven that, but for the lack of a proper cost realism

analysis, it would have received the contract award, nor is such a showing required to establish prejudice. Plaintiff needs to show only that it would have had a *substantial chance* of receiving the award. *Statistica*, 102 F.3d at 1582. Given the magnitude of the total contract value, as compared with the relatively narrow margin by which CRA purportedly underbid UP & UP, the Court finds that plaintiff has met this burden.

### 3. *Partial Motion to Dismiss*

■ Defendant has moved to dismiss that part of this action relating to the claims processing portion of the HHS contract with CRA. As discussed above, on September 24, 2002–during the pendency of this action-HHS sent a letter to CRA giving notice that, effective December 31, 2002, the claims processing portion of the contract, along with other less significant tasks, were to be terminated for the Government's convenience. Defendant asserts that, insofar as plaintiff is protesting the award of the claims processing portion of the contract, this termination has divested this Court of its bid protest jurisdiction over plaintiff's action pursuant to (1) the Tucker Act and (2) the doctrine of mootness.

### A. *Tucker Act*

Under the Tucker Act, this Court "[has] jurisdiction to render judgment on an action by an interested party objecting to ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In its brief, defendant argues that "any alleged violation of statute or regulation in connection with HHS's claims processing award is of no consequence because that portion of the contract no longer exists." (Def.'s Resp. to Pl.'s Mot. for Inj. Relief & Def.'s Partial Mot. for J. on Admin. R., at 9.)

Defendant's Tucker Act argument is simply a restatement of its mootness argument; that is, if HHS's impending termination of the claims processing portion of CRA's contract has rendered the plaintiff's action partially moot, then this Court lacks jurisdiction to consider the mooted part of the action. Thus, the jurisdiction question depends en-

tirely on whether plaintiff's protest is partially moot as a result of HHS's September 24, 2002 letter to CRA.

### B. *Mootness*

" 'The mootness doctrine originates from the "case or controversy" requirement of Article III of the United States Constitution.' " *CCL Serv. Corp. v. United States*, 43 Fed. Cl. 680, 688 (1999) (quoting *Northrop Corp., Northrop Elecs. Sys. Div. v. United States*, 27 Fed.Cl. 795, 800 n. 4 (1993)). "If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction." *NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed.Cir. 1998). " 'A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)).

In the instant case, HHS's termination has not yet occurred. HHS merely announced its intention to partially terminate its contract effective December 31, 2002. It is certainly within HHS's power to rescind its pending termination if it so desires. Indeed, HHS's own actions demonstrate that its planned partial termination of CRA's contract is, until the termination actually occurs, merely a tentative decision. In its September 24, 2002 letter to CRA, HHS stated that it was terminating for convenience "Tasks III A Preferred Provider Networks, Task III B Claims Processing, Task III C Utilization and Quality Management, and all portions of Task IV except those which pertain to Task II On–Site Medical and Support Services...." On October 4, 2002, however, HHS sent another letter to CRA revising the scope of its previous partial termination notice, stating: "The Government is now removing all reference to the request to terminate any part of Task IIIA...." HHS's planned termination is, at this juncture, merely a plan, and is not sufficient to divest this Court of jurisdiction over any part of this action.

Moreover, even assuming that HHS's impending partial termination could be considered definite and certain, the underlying dis-

pute between the parties still remains. In deciding whether subsequent circumstances have rendered an action moot, the Court must distinguish between circumstances that impact the viability of the underlying controversy and those that merely affect the relief that plaintiff seeks. "Mootness of an action relates to the basic dispute between the parties, not merely the relief requested." *Intrepid v. Pollock*, 907 F.2d 1125, 1131 (Fed. Cir.1990). In the instant case, HHS awarded all portions of the contract to CRA based on HHS's evaluation of each bidder's total estimated cost to perform all tasks required under the solicitation, including those that HHS intends to terminate. Plaintiff's complaint attacks the validity of HHS's decision to award the contract to CRA. That single award decision would form the basis of the parties' dispute even after HHS partially terminates CRA's contract. HHS's planned termination of the claims processing portion of CRA's contract does not, therefore, render the parties' underlying dispute moot.

Defendant argues that HHS's impending partial termination of CRA's contract is comparable to the facts in *CCL Serv. Corp.*, where, during the pendency of a bid protest, the Government terminated the seven contracts at issue. *CCL Serv. Corp.*, 43 Fed.Cl. at 684. In *CCL Serv. Corp.*, the Court held that the protest was "definitely moot in light of the cancellation of the contracts." *Id.* at 690.

*CCL Serv. Corp.* is, however, inapposite to the instant case. In *CCL Serv.Corp.*, the Government terminated the seven contracts at issue in full, and also canceled the solicitation under which the contracts were awarded, ensuring that no future contracts could be awarded under the solicitation on which the protest was based. *CCL Serv. Corp.*, 43 Fed.Cl. at 684. Conversely, in the instant case, HHS has expressed an intent to partially terminate CRA's contract. CRA would continue performing the unterminated portion of the contract, which remains at issue. There remains, therefore, a live controversy before the Court. Accordingly, defendant's partial motion to dismiss is denied.

### 4. *Injunctive Relief*

■ During oral argument, the parties agreed to merge the Court's consideration of the plaintiff's motions for preliminary and permanent injunctions. Having established that HHS's contract award to CRA was arbitrary and capricious and not in accordance with law, and that plaintiff was prejudiced thereby, plaintiff must make three additional showings to be entitled to injunctive relief: "(i) that it will suffer specific irreparable injury if the administration of the contract is not enjoined; (ii) that the harm to be suffered by it outweighs the harm to the government and third parties if the injunction were issued; and (iii) that granting the requested relief serves the public interest." *Seattle Security Servs., Inc. v. United States*, 45 Fed.Cl. 560, 571 (2000) (citations omitted).

#### A. *Irreparable Injury*

Plaintiff argues that, without injunctive relief, its only available remedy would be the recoupment of its bid and proposal costs; it would not be able to recover lost profits associated with its loss of business. "This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm." *Id.* (citing *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed.Cl. 312, 323 (1998)). As the contract at issue is still in the first year of a five-year period of performance, an award of bid and proposal costs would not adequately compensate plaintiff for its loss of this contract award. Plaintiff has shown, therefore, that it will suffer irreparable injury without injunctive relief.

#### B. *Balance of Hardships*

The Government has not demonstrated that it would be significantly harmed if this Court awards plaintiff injunctive relief. The plaintiff was the predecessor contractor prior to CRA. A resolicitation of the contract at issue, and possible transition to plaintiff, would not result in any demonstrated harm to the Government. Conversely, absent injunctive relief, plaintiff would be denied the opportunity to compete, on a level playing field, for the potential five-year contract at

issue. The Court finds, therefore, that the balance of hardships militates in plaintiff's favor.

### C. *Public Interest*

Given HHS failure to perform a cost realism analysis of CRA's proposal, the award to CRA may not have been the "best value" available to the Government. UP & UP may be able to offer the Government, and hence the public, a better alternative if given the chance to have its proposal fairly and properly evaluated. *See R & W Flammann GmbH v. United States,* 53 Fed.Cl. 647, 657 (2002). Furthermore, "[i]t is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Seattle Security,* 45 Fed.Cl. at 572. The Court finds that granting an injunction would serve the public interest "in protecting the integrity of the procurement system from unreasonable or irrational conduct and in ensuring that contracting agencies provide sufficient documentation to permit proper review of their actions...." *Day & Zimmermann Servs., A Division of Day & Zimmermann, Inc. v. United States,* 38 Fed.Cl. 591, 610 (1997).

### CONCLUSION

For the foregoing reasons, the Court finds that HHS's contract award to CRA was arbitrary and capricious and not in accordance with law, and that plaintiff was prejudiced by HHS's improper award. The Court further finds that plaintiff has established the prerequisites for the issuance of permanent injunctive relief. Accordingly, subject to the provisions below, plaintiff's motion for a permanent injunction is GRANTED. Defendant's motion for judgment upon the administrative record is DENIED and its partial motion to dismiss is DENIED. In consideration of the above, it is hereby ORDERED:

1. Defendant shall terminate HHS Contract No. 233–02–0011 with CRA on or before December 31, 2002, and is thereafter permanently enjoined from proceeding with that particular contract or any other contract under HHS Solicitation No. 282–99–0001.

2. In a manner not inconsistent with this opinion, the Government may resolicit bids for services covered by the subject contract and award a new contract.

3. Plaintiff is awarded bid preparation and proposal costs. Pursuant to the parties' stipulation filed January 31, 2003, the parties have resolved plaintiff's entitlement to bid preparation and proposal costs.

4. The Clerk shall enter judgment for the plaintiff. Costs for plaintiff.