**HP ENTERPRISE SERVICES, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 11–888 C.

United States Court of Federal Claims.

April 5, 2012.[1]

1. This opinion was issued under seal on March 13, 2012. Pursuant to ¶ 5 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. No redactions were proposed by the parties. Thus, the sealed and public versions of this opinion are identical, except for the publication date and this footnote.

Kevin J. Maynard, Washington, DC, for plaintiff. Rand L. Allen, Kara M. Sacilotto, and Tracye Winfrey Howard, of counsel.

Jeffrey D. Klingman, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Washington, DC, for defendant.

## OPINION AND ORDER

BUSH, Judge.

HP Enterprise Services, LLC (HP) filed its post-award bid protest complaint on December 19, 2011. HP challenges the award

of a contract to L–3 Services, Inc. (L–3). The contract is administered by the United States Air Forces in Europe (Air Force or Agency) and is for "healthcare information management and information technology support services." Compl. ¶ 1. HP, the incumbent contractor for these services, seeks permanent injunctive relief so as to cancel the contract award to L–3.[2] *Id.* ¶ 5.

The administrative record (AR) of this procurement was filed on January 6, 2012. Briefing was filed according to an expedited schedule and oral argument was held on February 23, 2012. As discussed below, the Agency's award decision was arbitrary and capricious. Defendant's motions to dismiss and for judgment on the administrative record are denied, and plaintiff's motion for judgment on the administrative record is granted.

## BACKGROUND

The Agency is responsible for military medical facilities in Europe and the contract provides decentralized information management services in support of the Agency's mission. AR at 479. The previous contract vehicle for this requirement was due to expire on September 14, 2011; the award challenged in this protest was for a one-year bridge contract which would allow the Agency sufficient time to procure a five-year follow-on contract. *Id.* at 191–92. The particular type of contract vehicle utilized by the Agency was a task order against a General Services Administration Indefinite–Delivery Indefinite–Quantity Multiple–Award Schedule contract (GSA Schedule), governed by Federal Acquisition Regulation (FAR) Subpart 8.4—Federal Supply Schedules (FSS). *Id.* at 191.

## I. The Solicitation

On May 26, 2011, the Air Force posted on the GSA e-Buy website Solicitation No.

FA5613–11–R–0009 for the award of a task order for healthcare information management and information technology support services in Europe. AR at 194, 206, 225. The solicitation provided that there would be a 1.5–month phase-in period from August 1 to September 14, 2011, a 3–month base period from September 15 to December 14, 2011, and a 9–month option period from December 15, 2011 to September 14, 2012.[3] *Id.* at 208–10. The Air Force could exercise the option by providing written notice to the contractor not later than 15 calendar days prior to the end of the base period.[4] *Id.* at 215.

Award would be made to "the lowest price, technically acceptable" offer which conformed to the solicitation. AR at 213. Of particular importance in this protest, offerors were warned in "Note 2" that "[i]n order to be eligible for award the Contractor's GSA Schedule must cover the entire period of performance of the resultant contract Task Order!" *Id.* at 214 (emphases removed). On May 31, 2011, the Agency responded to the following question, Question 8, regarding the requirement in Note 2:

> [Question] 8: Is a GSA contract holder eligible to receive the award if the ... GSA contract *will expire during the proposed* [Task Order] period of performance (POP), even with the availability of options to extend the covering GSA contract, which, if extended would cover the entire proposed [Task Order] POP?
>
> Response: No

*Id.* at 311. On June 1, 2011, however, the Agency issued a revision to its previous answer that changed its response from "No" to the following:

> In order to be eligible for award the Contractor's GSA Schedule contract has to still be in an active period by the time the

---

**2.** The parties agreed to resolve plaintiff's request for a preliminary injunction along with the merits of this protest.

**3.** Due to delays in the procurement of the task order the phase-in period was shortened, although the base period and option period remained unchanged. AR at 388.

**4.** The Air Force regarded December 15, 2011 as the option exercise date, not November 30, 2011. *See* AR at 495. The court adopts this reading of the solicitation. In any case, either of these dates would raise the same legal issue.

option to extend the term of the proposed contract Task Order will be exercised.

*Id.* at 312–13.

## II. Receipt of Proposals

By June 24, 2011, six timely proposals were received in response to the solicitation. AR at 195. The contracting officer (CO) entered into discussions with all offerors on July 29, 2011. *Id.* By August 19, 2011, four timely Final Proposal Revisions were received by the CO, and the other two offerors relied on their initial proposals. *Id.* HP had the lowest price technically acceptable offer, but the CO noted a concern with the expiration date of HP's GSA Schedule. *Id.* at 196.

## III. HP's Expiring GSA Schedule Contract and Expected Extensions

HP's initial and revised proposals provided to the Air Force the following information regarding the active period of HP's GSA Schedule:

> This offer is made under the terms and conditions of HP['s] GSA Schedule GS–35F–0323J which expires on September 26, 2011. HP[ ] is currently negotiating our GSA schedule for the Option period covering years 11–15 which will cover until March 31, 2014. After that we have one remaining option period (Years 16–20) which would end March 31, 2019. . . . To confirm this information, our GSA Contract Specialist, Vera Greene can be reached at 2200 Crystal Drive, Suite 606, Arlington, VA 22202, Phone: (703) 605–2675, Fax: (703) 605–9837, Email: vera.greene@gsa.gov.

AR at 373, 452. Thus, HP's GSA Schedule was due to expire during the base period of the task order (September 15 through December 14, 2011), and before the option period (December 15, 2011 through September 14, 2012). The Agency therefore engaged in efforts to determine whether HP's offer met the solicitation's requirement that an active GSA Schedule be in place to cover the option period of the task order.

The Agency communicated with at least four persons on the subject of expiring GSA Schedules, short extensions of those GSA Schedules, and the exercise of longer option periods for GSA Schedules that are due to expire. These included: (1) Mr. Paul Price, a GSA Customer Service Director based in Europe; (2) Ms. Theresa Williams, a GSA team leader based in Arlington, VA; (3) Ms. Vera Greene, the GSA contract specialist assigned to HP's GSA Schedule; and, (4) Ms. Dorothy Pines, HP's Contract Manager who submitted HP's proposal in response to the solicitation. These communications began on August 19, 2011 and finished on August 29, 2011.[5] AR Tabs 17–18.

The Air Force appeared to have three questions in mind during this period of telephone and email communications. *See* AR Tab 18. The first question, specific to HP's GSA Schedule, was whether or not HP's GSA Schedule would be extended to cover the time when the option period of the task order was to be exercised. The second question, not specific but general, was whether a task order may be placed against a GSA Schedule that would soon expire. The third question, also general in nature, was whether an option period of a task order could be exercised after a GSA Schedule, upon which the task order had been placed, had expired. Unfortunately, the Air Force failed to clearly express these questions in every instance, and received answers which ultimately proved to be unhelpful.

Mr. Price was asked all three questions. He forwarded the first question to Ms. Greene, but did not receive a response because she was out of the office for more than one week. He did, however, do a better job of framing the first question to Ms. Greene than did the Air Force ten days later, as discussed below. Here is his inquiry of August 19, 2011:

> Subject: GS–35F–0323J, HP Enterprise Services
>
> Hello Vera,

---

5. Interestingly, the contracting officer for the Air Force stated that the decision to disqualify HP occurred on August 26, 2011, three days before Ms. Greene communicated with the Air Force.

AR at 196. Ms. Greene's comments were nonetheless cited as support for the Agency's decision to disqualify HP's proposal. *Id.* at 201, 495.

I'm Paul, one of the [GSA Customer Service Directors] in Europe. The subject [GSA Schedule] contract is set to expire on September 26, 2011. Is there an option left to be exercised? If so, do you see any reason why the option wouldn't be exercised? The [Air Force contracting specialist] on the cc line [of this email] is considering placing an order and would like to know.

Thank you.—Paul

AR at 467. Mr. Price also contacted HP and relayed to the Air Force that he "heard from [HP] that there is one more 5–year option left on their [GSA Schedule] contract and they anticipate this option being exercised immediately on September 26." *Id.* at 468.

Mr. Price provided an answer to the Air Force's second question by stating that "it is OK for the performance of a task order to extend past the [GSA] Schedule contract expiration date" and citing to FAR 52.216–22, 48 C.F.R. § 52.216–22 (2011). AR at 470–71. As to the third question, Mr. Price noted some difference of opinion, but concluded that "I just think the safest thing to do is only exercise an option if the [GSA] Schedule contract is still valid. I just don't think the risk [of exercising an option period of a task order after the GSA Schedule has expired] is worth the reward." *Id.* at 471. Mr. Price's advice was sought and given on August 19, 2011.

On August 22, 2011, the Air Force's contracting specialist, Mr. Stefan Scherer, contacted Ms. Williams, apparently as a substitute for the absent Ms. Greene, by telephone and by email. The Air Force's first question, as described above, was again posed:

Subject: Re: GS–35F–0323J, HP[ ]

As already discussed over phone, our office is requesting GSA['s] input regarding a possible extension of subject GSA schedule which is about to expire 26 Sep 2011. Please let me know if subject schedule will be extended and for how long, additionally I'd like to ask when a modification is expected to be in place for this contractual action.

AR at 473. The court notes a subtle shift from Mr. Price's question "do you see any reason why the option wouldn't be exercised," to Mr. Scherer's question "let me know if subject schedule will be extended and for how long, additionally I'd like to ask when a modification is expected to be in place for this contractual action." *Compare id.* at 467 *with id.* at 473. Ms. Williams' response was short:

Per our conversation Contract GS–35F–0323J will eventually be extended until about April 2013. There are still some[ ]things to be completed. I am Vera Greene['s] Team Lead, Sheredia Brown is the Branch Chief[.] Everyone is out of the office this week except for me.

*Id.*

Apparently not satisfied with this assurance from Ms. Williams, Mr. Scherer asked for more detail regarding the eventual extension of HP's GSA contract on August 23, 2011:

If my assumption is correct ... [that] the [GSA] Contracting Officer may exercise the option by providing a written notice to the Contractor within 30 days, unless otherwise noted, prior to the expiration of the [GSA Schedule] contract or option, did your office already provide[ ] a written notice to HP[ ]? If not, when is it expected? One last question, when is the associated modification expected to be in place?

AR at 472. Ms. Williams responded to these concerns by stating that:

As per our conversation on August 23, 2011, the contractor is aware of the intent to extend GS–35F–0323J, however there are other things involved with the extension, such as negotiating, etc. I cannot give you a time as to when the modification will be in place. However when Ms. Greene returns I will have her contact you with an estimated date. If the contract is extended it will be until April 2013.

*Id.*

One might assume from this communication with Ms. Williams that Mr. Scherer would have concluded that Ms. Greene was the person who could confirm whether or not HP's GSA Schedule would be extended past September 26, 2011, and that Mr. Scherer would have been eager to pose the Air

Force's first question to her. Instead, on August 29, 2011 Mr. Scherer did not mention the Air Force's first question but proceeded to quiz Ms. Greene on the general topic of the third question, regarding the legality of exercising an option period of a task order after a GSA Schedule contract has expired:

I'd like to get your opinion on placing Task Orders (TO) against GSA Schedule contracts that are near expiration and whether or not it is permissible to exercise a TO option after the GSA Schedule contract (under which the task order was placed) expires.

Especially I'd like to get your interpretation of paragraph (d) of FAR Clause 52.216–22.

*"Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period."*

I understand that, even if the Schedule contract expires during the period of performance (POP) of the TO, the Contractor shall continue performance on the TO until the basic POP of the TO expires—as mentioned above—how does this apply to exercising TO options after the GSA Schedule contract (under which the task order was placed) expires.

Your quick response on this is greatly appreciated.

AR at 476. The court notes that neither HP nor the identifier for HP's GSA Schedule contract is mentioned in this email. Not surprisingly, Ms. Greene provided her "quick response" to the Air Force's third question and nothing more:

Although the Contractor is obligated to complete the Task Order (even if the contract expires) you CANNOT exercise a Task Order Option if the base [GSA Schedule] Contract is Expired.

*Id.*

Thus, the person identified by HP as the person who could confirm the status of its GSA Schedule contract was never asked by Mr. Scherer the Air Force's first question— whether HP's GSA Schedule would be extended to cover the time when the option period of the task order would be exercised. Although Mr. Scherer had resolutely pursued this information in his communications with Mr. Price and Ms. Williams, he totally ignored this topic in his August 29, 2011 email to Ms. Greene. Perhaps he did so because the decision to disqualify HP had already occurred on August 26, 2011. *See* AR at 196.

On August 23, 2011, the same day that Mr. Scherer was communicating with Ms. Williams, the Air Force CO, Mr. Harald Petry, contacted Ms. Pines at HP to request clarification of the status of HP's GSA Schedule contract. AR at 459. Mr. Petry stated that

We hereby request clarification on the subject solicititation: How does HP[ ] intend to meet the requirements of ... NOTE 2: "In order to be eligible for award, the Contractor's GSA Schedule contract has to still be in an active period by the time the option to extend the term of the proposed contract Task Order will be exercised."

*Id.* Ms. Pines provided two responses by email. First, HP stated on August 24, 2011 that

HP[ ] has been in ongoing negotiations with the GSA to finalize the renewal of our GSA Schedule.... We submit proposals and receive awards regularly with terms beyond one year. We provide the additional information as requested in your email below:

"We are currently negotiating our GSA Schedule renewal which will extend to March 31, 2014 and will cover the option period. GSA and HP[ ] hope to conclude negotiations by September 26, 2011. Given that both parties are negotiating in good faith, in the event that the negotiations need to continue, GSA would extend the contract. To confirm this information, please contact the Government GSA Contract Specialist, Vera Greene at 2200 Crystal Drive, Suite 606, Arlington, VA 22202,

Phone: (703) 605–2675, Fax: (703) 605–9837, Email: vera.greene@gsa.gov."

*Id.* at 461.

On August 26, 2011, HP emailed Mr. Petry again and provided an opinion it obtained from its "GSA Attorney" as to HP's eligibility to receive the task order award and as to the authority of the Air Force to exercise the option period once that task order was awarded to HP:

> The Indefinite Quantity clause in [our GSA Schedule contract] in subsection (d), provides that, "Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period."
>
> Thus, as long as an order is issued prior to the expiration of the [GSA Schedule] contract, the terms of the contract will govern the order even in the unlikely event that the [GSA Schedule] contract does not get extended.
>
> As for the first option period which starts December 15, 2011, after our contract is current[ly] set to expire (we expect an extension Mod soon), the Indefinite Quantity clause specifically addresses this point. It basically says that the underlying contract is treated as if it were still in effect even if the performance period of the order (including options) extends beyond the expiration of the underlying schedule contract.
>
> Our GSA Contract Specialist returns to the office on Monday, August 29, 2011. She is cc'd on this email and can be contacted for confirmation.

AR at 463.

Several assertions are apparent from these emails sent by Ms. Pines. HP informed Mr.

Petry, first, that negotiations for an extension of HP's GSA Schedule were ongoing, in good faith, and that modification of the GSA Schedule's expiration date was likely if negotiations were not completed by September 26, 2011.[6] Second, HP's attorney agreed with Mr. Price that a soon-to-expire GSA Schedule was no impediment to the award of a task order that would be governed by the terms of the GSA Schedule beyond its expiration date. Third, HP's attorney disagreed with Mr. Price's advice and opined that the option periods of a task order placed against a GSA Schedule could be exercised even after the GSA Schedule has expired.[7] Because Ms. Pines' second email was sent late at night on August 26, 2011 from the United States, Mr. Petry did not respond to Ms. Pines until August 27, 2011, one day after the decision to disqualify HP apparently took place. *See* AR at 196.

## IV. The Award Decision

In the Simplified Source Selection Report (SSSR), the Air Force noted that HP was the lowest price technically acceptable offeror. AR at 490–91, 496–97. However, HP's proposal was considered to be nonconforming to the solicitation and was eliminated from the competition. *Id.* at 497. A lengthy narrative explained the Agency's decision to eliminate HP, but for the court's purpose of providing a factual background for this protest this sentence provides the essence of the Agency's rationale:

> [HP] is not in compliance with [Note 2 of the solicitation because] their current GSA schedule is not [active] at the time when the proposed option period needs to be exercised on 15 Dec 2011, and additionally, an updated/extended schedule is not anticipated to be in place before [bridge] contract[ ] award, which is scheduled to be completed on or before 31 Aug 2011.

6. Indeed, the expiration date of HP's GSA Schedule had been temporarily extended for such a purpose on June 27, 2011, AR at 557, and was again temporarily extended on September 26, 2011, for the same reasons, *id.* at 1001 n. 3.

7. Ms. Pines' suggestion that this legal opinion could be confirmed by contacting Ms. Greene

may explain why Mr. Scherer asked Ms. Greene for her opinion on this issue. As a factual matter, HP's GSA Schedule did not expire because on November 21, 2011, HP's GSA Schedule contract was extended through March 31, 2014 by GSA's exercise of five option years. AR at 996.

*Id.* at 495. Therefore, the Air Force awarded the bridge contract to L–3, the "second low technically acceptable offeror who is in compliance with … Note 2," *id.* at 497 (punctuation and capitalization altered), also described as "the lowest price, technically acceptable and conforming offeror," *id.* (punctuation and capitalization altered).

## V. GAO Protest and Subsequent Events

After the Air Force awarded the contract to L–3 on September 1, 2011, HP filed a timely protest with the Government Accountability Office (GAO) on September 8, 2011. AR at 1001. That protest was denied on December 14, 2011. *Id.* Tab 30. GAO provided this interpretation of the revised response to Question 8 instruction that an offeror's GSA Schedule "has to still be in an active period by the time the option to extend the term of the proposed contract Task Order will be exercised":

> Although the agency's instruction was awkwardly drafted, it essentially required each vendor to demonstrate, by the time of award, that it would have an active GSA schedule contract at the time the 9–month task order option was scheduled to be exercised [on December 15, 2011].

*Id.* at 1001. GAO also found that "there was nothing impermissible about the Air Force's decision to require, in its solicitation, that the question be resolved at the time of award." *Id.* at 1001–02.

HP filed its bid protest complaint in this court on December 19, 2011. L–3 has not intervened in this protest. The Air Force has stayed performance of the bridge contract award to L–3 until HP's protest is resolved by this court. The Air Force has continued to obtain contract services from HP, the incumbent contractor, during the pendency of this litigation. Def.'s Mot. at 28. Plaintiff notified the court that a solicitation for the five-year follow-on contract was issued by the Air Force on January 30, 2012. Pl.'s Reply at 27 n. 14. HP's protest of the bridge contract award is ripe for resolution.

## DISCUSSION

### I. Bid Protest Jurisdiction

█ This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (*ITAC* ); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

### II. Standard of Review for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed. Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### III. Bid Protest Review

█ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE* )). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,*

575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302). A protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing before this court. *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307–08 (Fed.Cir.2006) (citations omitted).

■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001)). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts,* 216 F.3d at 1058.

■ *De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir. 1988)). Examples of arbitrary and capricious agency action include when "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Ala. Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372,

1375 (Fed.Cir.2009) (*Alabama Aircraft*) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted).

■ " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts,* 216 F.3d at 1057).

## IV. Standing

■ Only a protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement and thereby standing before this court. *Rex Service,* 448 F.3d at 1307–08. Defendant challenges HP's standing to bring this protest. *See* Def.'s Mot. at 11–19; Def.'s Reply at 1–16. The thrust of defendant's challenge to HP's standing is that HP's proposal did not conform to the solicitation's requirement

that the offeror's GSA Schedule "must cover the entire period of performance of the resultant contract Task Order!" AR at 214 (emphases removed). Defendant asserts that because "HP's proposal was a non-compliant proposal that did not satisfy the requirements of the solicitation FSS provisions, ... HP lacks standing." Def.'s Reply at 16.

■ The court disagrees with defendant's standing analysis. The basis of HP's protest is that the Air Force erred in finding HP's proposal to be nonconforming to the solicitation's requirement regarding the active period of an offeror's GSA Schedule. Defendant thus asks the court to decide the merits of this protest in order to determine whether or not HP has standing to bring this suit. As this court has noted, "the Government cannot require a plaintiff to prove the merits of its case in order to demonstrate standing." *Magnum Opus Techs., Inc. v. United States,* 94 Fed.Cl. 512, 530 n. 12 (2010). But for the procurement error alleged in the complaint, HP had a substantial chance of receiving the contract award.[8] *See ITAC,* 316 F.3d at 1319 (stating that a bid protest plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process") (citation omitted). For this reason, HP has standing to bring this bid protest.

## V. Erroneous Disqualification of HP's Proposal

### A. Amendment of the Solicitation's GSA Schedule Requirement

■ Questions and answers provided bidders do not always serve to modify or amend a solicitation. *See, e.g., JSR Servs., LLC,* B–401500, 2009 CPD ¶ 168, 2009 WL 2596106, at *2 (Comp.Gen. Aug. 24, 2009) (stating that in that procurement, "[t]here ... was no reasonable basis for the protester to assume that the questions and answers [provided bidders] were intended to amend the solicitation requirements."); *McNeil Techs., Inc.,*

B– 278904, B– 278904.2, 98–1 CPD ¶ 96, 1998 WL 150352, at *4 (Comp.Gen. Apr. 2, 1998) (declining to consider an answer provided potential bidders as an amendment to an RFP because, in part, the answer "was never incorporated by amendment into the RFP"). However, in a substantial number of bid protests, a clarifying response to a bidder's question, or other information provided to all bidders, has been found to amend or modify a particular solicitation provision. *See, e.g., Linguistic Sys., Inc.,* B– 296221, 2005 CPD ¶ 104, 2005 WL 1299516, at *1 (Comp.Gen. June 1, 2005) (stating that an answer to a bidder question posted on GSA's website functioned as an amendment to the solicitation provision at issue in that protest); *Scientific Research Corp.,* B– 260478, B–260478.2, 95–2 CPD ¶ 8, 1995 WL 404157, at *5 (Comp.Gen. July 10, 1995) (stating that "information disseminated during the course of a procurement that is in writing, signed by the contracting officer, and sent to all offerors, meets all the essential elements of a solicitation amendment and will therefore bind both the offerors and the agency") (citation omitted); *see also Allied Signal, Inc., Elec. Sys.,* B– 275032, B– 275032.2, 97–1 CPD ¶ 136, 1997 WL 173945, at *6 (Comp.Gen. Jan. 17, 1997) (stating that the protestor in that procurement "could reasonably rely on the [questions and answers on the agency's] electronic bulletin board" to interpret the solicitation's requirements). This court recently held that answers to bidder questions amended a solicitation. *BayFirst Solutions, LLC v. United States,* 102 Fed.Cl. 677, 689 n. 15 (2012). In the court's view, bidder questions and the agency's answers thereto may amend a solicitation, depending on the circumstances of the procurement.[9]

Here, the court notes first that the Agency's response to bidder Question 8, regarding the eligibility of bidders with expiring GSA Schedules, was posted on GSA eBuy, and was thus formally distributed to all offerors. Second, the Agency's answer to Question 8 was revised from "No" to "In order to be

---

8. Indeed, it appears that HP would have received the award but for the Agency's decision to disqualify HP because of the expiration date of its GSA Schedule.

9. Whether the binding effect of the agency's answer to a bidder's question is viewed as a functional amendment of the solicitation provision, or as a clarification of that provision, would not change the result in this case.

eligible for award the Contractor's GSA Schedule contract has to still be in an active period by the time the option to extend the term of the proposed contract Task Order will be exercised." AR at 311–13. The Agency thus issued a revised, and radically different, response to Question 8, on a separate date, when all of its other responses to the first set of bidder questions remained the same. Bidders could not ignore the change to the Agency's response to Question 8.[10] The court finds that the revised response to Question 8 was given special prominence in this procurement, and functioned as an amendment to Note 2 of the solicitation.

The court's determination that Note 2 of the solicitation was amended by the Agency's revised response to Question 8 is fully supported by the record. The Agency, in every contemporaneous document discussing the requirement that an offeror have a GSA Schedule that would cover the period of performance of the task order, always referenced its revised response to Question 8 or the content thereof. *See* AR at 459, 493, 495, 500. Similarly, in proceedings before GAO, the contracting officer confirmed that the text of the Agency's revised response to Question 8 was binding. *See id.* at 199 (stating that the Agency's revised response to Question 8 "revised the requirement" set forth in Note 2 of the solicitation). The Agency's memorandum of law before GAO also relied on the text of the revised response to Question 8 to describe the GSA Schedule eligibility requirement. *See id.* at 184 (emphasizing that an offeror must show that its "GSA schedule contract would be in effect by the time the Air Force contemplated exercising the option to extend the term of the task order"). Even the GAO decision which denied HP's protest implicitly acknowledged that the solicitation's requirement for an "active" GSA Schedule was best understood through the "awkwardly drafted" revised response to Question 8, rather than through the text of Note 2:

> Although the agency's instruction was awkwardly drafted, it essentially *required* each vendor to demonstrate, by the time of

award, that it would have an active GSA schedule contract at the time the 9–month task order option was scheduled to be exercised [on December 15, 2011].... [T]he record shows that the agency concluded that the only way to be certain that the contract would be active at the time it would need to exercise the 9–month option was to examine the question as of the time of the award.

*Id.* at 1001 (emphasis added). The only possible reading of the record before the court is that Note 2 of the solicitation was amended by the Agency's revised response to Question 8.

## B. Latent Ambiguity and *Contra Proferentem*

### 1. Ambiguity in a Solicitation

The precedent of the United States Court of Appeals for the Federal Circuit directs this court as it determines whether or not a contract or solicitation provision is ambiguous. An oft-cited case provides the structure for such an inquiry:

> When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity. To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a "zone of reasonableness." If this court interprets the contract and detects an ambiguity, it next determines whether that ambiguity is patent. The doctrine of patent ambiguity is an exception to the general rule of *contra proferentem* which construes an ambiguity against the drafter, here, [the government]. An ambiguity is patent if "so glaring as to raise a duty to inquire[.]" If an ambiguity is not patent but latent, this court enforces the general rule.

*Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999) (citations omitted). Even if the court has detected a latent ambiguity according to these principles and would otherwise apply the rule of *contra proferen-*

---

**10.** When the Air Force issued a second set of questions and answers, and a revision to that second set of questions and answers, the Air Force did not use the same "from *X* to *Y*" format that it used for the revised response to Question 8.

*tem,* however, the protestor will not benefit from this rule unless it can show reliance on its reasonable interpretation of the ambiguous provision. *See, e.g., NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1162 (Fed.Cir. 2004) (citing *Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir. 1986)). Whether an ambiguity is patent or latent is decided on a case-by-case basis. *Id.* at 1159 (citation omitted).

### 2. Two Reasonable Interpretations of the Solicitation's Requirement for an "Active" GSA Schedule

The contested GSA Schedule requirement states that "[i]n order to be eligible for award the Contractor's GSA Schedule contract has to still be in an active period by the time the option to extend the term of the proposed contract Task Order will be exercised." AR at 313. According to defendant, this provision could reasonably be interpreted as follows:

> The common sense interpretation of the revised response [to Question 8] is that HP was required to demonstrate, either in its proposal or, at the latest, by the time the award was made, that its existing FSS contract would still be active on the date of the Air Force's deadline for exercising the task order option.

Def.'s Mot. at 15 (footnote omitted). The court finds that this interpretation falls within a zone of reasonableness for the solicitation's GSA Schedule requirement.

Plaintiff, on the other hand, provides two interpretations of the revised response to Question 8. Plaintiff's first, and more lenient, interpretation of the eligibility requirement is that an offeror was eligible for award "so long as the [offeror's] Schedule ha[d] not expired at the time of award and there [we]re options available that, if exercised, would cover the task order's period of performance." Pl.'s Reply at 20. The court rejects this interpretation as unreasonable, because it relaxes the Agency's demand that the GSA Schedule "still be in an active period by" December 15, 2011. AR at 313. According to plaintiff's lenient interpretation of the revised response to Question 8, all that was required was that an offeror's GSA Schedule

include an option period, which, "if exercised" by December 15, 2011, would extend beyond September 14, 2012. That formulation does not fully capture the urgency of the Agency's stated interest in awarding to an offeror whose GSA Schedule would be active on December 15, 2011.

Plaintiff also suggests, somewhat indirectly, that the revised response to Question 8 created an eligibility requirement that resembled the requirement referenced in a GAO decision issued in 2005. *See* Pl.'s Mot. at 22. In that decision, GAO agreed with GSA guidance that GSA Schedule contracts support task order awards, including options, so long as the offeror's GSA Schedule has an option period which would cover the period of performance of the task order and its options, and there is no indication that the GSA Schedule option period would not be exercised:

> FSS contracts [are] valid for purposes of award of a contract utilizing a [GSA S]chedule as long as there are option periods that can be exercised that would cover the contract award period, and there is no indication that the FSS contract option will not be exercised.

*Knoll, Inc.; Steelcase, Inc.,* B– 294986.3, B– 294986.4, 2005 CPD ¶ 63, 2005 WL 696321, at *9 (Comp.Gen. Mar. 18, 2005) (*Knoll*). Plaintiff repeatedly relies on *Knoll* to interpret the revised response to Question 8. *See* Pl.'s Mot. at 21–22, Pl.'s Reply at 16–17, 25. In the court's view, the standard referenced in *Knoll* is entirely consistent with the solicitation's requirement for an active GSA Schedule, and provides a reasonable interpretation of this ambiguous provision.

As plaintiff points out, both *Knoll* and the "GSA Ordering Guidelines" available on GSA's website provide a context for the award of task orders, including options, placed against a GSA Schedule. The GSA Ordering Guidelines state in relevant part:

> Options may be included on orders placed against GSA Multiple Award Schedule (MAS) contracts, ... *provided that:*

> Funds are available;

> The requirement covered by the option fulfills an existing government need;

Prior to exercising an option, the ordering activity ensures that it is still in the government's best interest, i.e., that the option is the most advantageous method of fulfilling the government's need, price, and other factors considered; and

*The options do not extend beyond the period of the Schedule contract, including [GSA Schedule] option year periods.*

AR at 975 (emphasis added). Given this context, plaintiff's less lenient interpretation of the revised response to Question 8 is reasonable. Plaintiff's reasonable interpretation of the solicitation is that the Air Force required, at a minimum, that an offeror's GSA Schedule have an option period that covered the period of performance of the task order, including December 15, 2011 in particular, and that there be no indication that the option period of the offeror's GSA Schedule would not be exercised. *See* Pl.'s Reply at 16–17.

### 3. The Ambiguity was Latent

Having found that the GSA Schedule requirement was subject to two reasonable interpretations and was thus made ambiguous, the court turns to the question of whether the ambiguity was patent or latent. The parties' arguments and citations to caselaw are not particularly helpful in this regard, because the question must be decided on a case-by-case basis. *NVT*, 370 F.3d at 1159. The court notes, first, that this is not a case where there are two or more conflicting solicitation provisions that raise a duty to inquire on the part of the protestor. *Cf., e.g., Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1381 (Fed.Cir.2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."). Rather, the Air Force initially framed the issue with the unambiguous Note 2, then stated a similarly unambiguous position in its first response to Question 8, before finally defining the requirement with its revised response to Question 8. The ambiguity exists solely within the text of that single, awkwardly drafted sentence:

In order to be eligible for award the Contractor's GSA Schedule contract has to still be in an active period by the time the option to extend the term of the proposed contract Task Order will be exercised.

AR at 313.

The court has compared this ambiguity to others noted in this court's caselaw and in GAO decisions and concludes that the ambiguity here is latent. In a recent GAO decision, a protestor asserted that an eligibility requirement in a solicitation could be read to include business entities not yet certified as eligible small businesses. *Commandeer Constr. Co.,* B– 405771, 2011 CPD ¶ 287, 2011 WL 6880720, at *4 (Comp.Gen. Dec. 29, 2011), *modified, Dep't of Veterans Affairs— Reconsideration,* B– 405771.2, 2012 WL 523946 (Comp.Gen. Feb. 15, 2012). The agency had a more stringent view of the eligibility requirement; GAO found that both interpretations were reasonable, and noted that the protestor's interpretation was "not contradicted by other provisions of the solicitation." *Id.* The protest was sustained because of this latent ambiguity in the solicitation.

In another bid protest, this court reviewed a solicitation phrase which included an eligibility requirement: "in order to be considered for award, 'offerors must submit a proposal for no less than 75% of the services within a region.'" *Heritage of Am., LLC v. United States,* 77 Fed.Cl. 66, 74 (2007) (quoting solicitation). The plaintiff in that case submitted a bid reflecting its understanding of the requirement, that it should bid on at least seventy-five percent of the estimated labor hours required in a particular region. *Id.* The government construed the requirement differently, insisting that an offeror bid on at least seventy-five percent of the installations in a region, and rejected the protestor's bid. *Id.* This court found that this ambiguity in the solicitation was not a patent ambiguity, and ruled in favor of the protestor on this and other issues. *Id.* at 72 n. 7, 80.

This case is not unlike *Commandeer Construction* and *Heritage of America,* because this solicitation, too, contains no glaring or obvious inconsistency which would give rise

to a patent ambiguity. The court finds nothing glaring in the revised response to Question 8 that would lead HP to inquire as to whether the Agency had a more stringent eligibility requirement in mind than the eligibility standards expressed in *Knoll* and the GSA Ordering Guidelines. The Air Force had indicated that it was lessening its overly stringent insistence that an offeror have a GSA Schedule with an expiration date after September 14, 2012. An offeror had no reason to suspect that the Agency required something more definitive than an adequate option period on the offeror's GSA Schedule and reasonable expectations that its GSA Schedule option period would be exercised. The GSA Schedule eligibility requirement thus contained a latent ambiguity, and the general rule of *contra proferentem* will be applied here.

The court notes that HP's reliance on its interpretation of the GSA Schedule is adequately shown by the record. HP noted in its initial and final proposals that it had GSA Schedule option periods that would cover the entire period of performance of the task order. AR at 373, 452. HP also asserted that negotiations for the exercise of its GSA Schedule's option period were ongoing, and provided contact information so that the Air Force could confirm HP's representation. *Id.* at 452. Thus, HP's proposal shows that HP interpreted the GSA Schedule requirement as capable of being satisfied by an offeror possessing a GSA Schedule option period of adequate length, as long as there was no indication that the option period would not be exercised.[11]

#### C. HP's Proposal Conformed to the Solicitation Requirement for an "Active" GSA Schedule

The solicitation required that an offeror's GSA Schedule have an option period that covered the period of performance of the task order, including December 15, 2011 in particular, and that there be no indication that the option period of the offeror's GSA Schedule would not be exercised. The court

has carefully reviewed the record and must conclude that HP met this requirement. Its GSA Schedule included an option period of adequate length, and there was no indication in the record before the Air Force that GSA would not exercise that option period.

The Air Force communicated with GSA and received no indication that HP's GSA Schedule would not be extended. Neither Mr. Price nor Ms. Williams gave the Air Force any indication that HP's GSA Schedule would not be extended. Ms. Greene was never directly asked the question by the Air Force. Based on the record before the Air Force, and now before this court, HP should not have been eliminated from the competition based on the solicitation's GSA Schedule requirement.

#### D. Arbitrary and Capricious Procurement Decision

█ Here, HP met the amended solicitation requirement provided by the revised response to Question 8. The Air Force held HP to a higher standard, which is not clearly stated but which appears to have required that the offeror have, as of the date of proposal submission, a GSA Schedule expiration date after December 15, 2011, or have, as of the contract award date, an executed modification of its GSA Schedule's expiration date. *See* AR at 495. It is possible that the Air Force might have accepted a written statement from GSA that HP's GSA Schedule option period would be exercised by a certain date, as long as that date was before December 15, 2011, but it appears more likely that the Air Force believed it could not award to HP until the option period of HP's GSA Schedule had been exercised. *See* AR at 495 ("The Government cannot wait with the award of this bridge task order until GSA and [HP] eventually reach agreement and [HP's GSA S]chedule is actually extended past the date for exercise of the task order option."). In any case, it is clear that the Air Force disqualified HP not pursuant to the eligibility standard established by the solicitation but pursuant to a heightened eligibility

---

11. When later contacted by the Air Force, HP again tried to reassure the Agency that there were no indications that GSA would not exercise

the five-year option period of HP's GSA Schedule. AR at 461, 463.

requirement. Because the requirement imposed on HP differed materially from the requirement in the solicitation, the Air Force's disqualification decision was arbitrary and contrary to law. *See, e.g., Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed.Cir.1999) (noting that the government must evaluate proposals and base its award decision solely on factors set forth in the solicitation) (citations omitted).

■ The court now turns to the Agency's irrational reliance on the GSA Ordering Guidelines. Defendant argues that the GSA Ordering Guidelines should not be used to interpret the solicitation's "active" GSA Schedule requirement. *See* Def.'s Mot. at 18. The court agrees with defendant that nothing in the solicitation indicated to offerors that the GSA Ordering Guidelines were incorporated into the solicitation.[12] Nonetheless, given the Agency's stated reliance on the GSA Ordering Guidelines, AR at 493, 499, the rationality of that reliance is a proper subject of inquiry for this court. Indeed, to affirm a procurement decision for reasons other than those provided by the procuring officials is prohibited by caselaw binding on this court. *See OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed.Cir.2000) (citations omitted).

■ As to the GSA Ordering Guidelines, the most pertinent provision of these guidelines states that task order "options may be exercised on GSA Schedule contract [task] orders, provided that ... [t]he options do not extend beyond the period of the Schedule contract, including option year periods." AR at 975. The guidelines therefore suggest that the Air Force *could* permissibly award the bridge contract task order to HP, because HP's GSA Schedule had option periods that extended well beyond the end of the period of performance of the task order.

The GSA Ordering Guidelines *cannot* however be read to support the following pronouncement in the SSSR, dated August 31, 2011, which was purportedly "in line" with the guidelines:

[T]he GSA Ordering Guidelines ... allow [a] contractor's performance of services through the end of a task order option period that is after the end of the Multiple Award Schedule's (MAS's) active period, *provided* the task order option period start date was prior to the MAS's active period end date.

AR at 493 (emphasis added). The Agency apparently misunderstood the relevant instruction in the GSA Ordering Guidelines regarding GSA Schedule contract option periods, and turned that instruction on its head.

The Agency also cited the GSA Ordering Guidelines in its Notification of Exclusion sent to HP on September 1, 2011, curiously quoting the provision referenced above, a provision which *supports* HP's eligibility for contract award, and which provides *no support* for the Agency's decision to exclude HP from the competition. *Id.* at 499. Based on the record before it, the court concludes that the Agency misconstrued the GSA Ordering Guidelines, and that its reference to and reliance on these guidelines was irrational. The procurement decision documented in the SSSR, which the court has already determined to be arbitrary and contrary to law, is further undermined by the agency's irrational misinterpretation of the GSA Ordering Guidelines. *See Alabama Aircraft*, 586 F.3d at 1375 (noting that when an agency's explanation of its decision runs counter to the evidence before the agency, that decision is arbitrary).

## VI. Prejudicial Error

■ It is obvious that HP was prejudiced by the Agency's arbitrary disqualification decision. HP had the lowest price technically acceptable offer, and was deprived of the bridge contract award because it was held to an irrationally heightened standard regarding the active period of its GSA Schedule. AR at 496–97. If a proper evaluation of proposals had occurred using the requirements communicated to offerors, there was a substantial chance that HP's proposal, not L–3's higher-priced proposal, would have been

---

**12.** As discussed *supra,* however, the GSA Ordering Guidelines provide an insight into the reasonable expectations of offerors confronted with the ambiguous solicitation requirement at issue in this case.

chosen for the bridge contract. HP has shown that it had a substantial chance of being awarded the contract if the demonstrated procurement error in this case had not occurred, and that HP suffered prejudice from that procurement error. *Linc Gov't Servs., LLC v. United States,* 96 Fed.Cl. 672, 696 (2010) ("[T]he plaintiff must show that it would have had a substantial chance of being awarded the contract but for the combined impact of any agency decisions *adjudged* to be unlawful.") (citations omitted). Because HP has prevailed on the merits, the court turns to the factors governing the award of injunctive relief.

## VII. Injunctive Relief

As the Federal Circuit has held:

To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.

*Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (citing *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004)). Here, plaintiff has succeeded on the merits. Thus, the first injunctive relief factor favors enjoining the Agency's contract award to L–3.

This court, in many cases, has found that the loss of the opportunity to fairly compete for a contract constitutes irreparable harm. *See, e.g., ViroMed Labs., Inc. v. United States,* 87 Fed.Cl. 493, 503 (2009) (noting that bid preparation and proposal costs are not equivalent to potential profits from a government contract); *Hosp. Klean of Tex., Inc. v. United States,* 65 Fed.Cl. 618, 624 (2005) ("Here, absent injunctive relief, [the protestor] will lose the opportunity to earn the profit it would have made under this contract. Such loss of profit, stemming from a lost opportunity to compete for a contract on

a level playing field has been found sufficient to constitute irreparable harm.") (citations omitted); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000) (holding that the "potential loss of valuable business" may constitute irreparable harm). Defendant asserts that recent precedent shows that this court has not properly applied the "irreparable harm" factor in bid protest cases, and that economic harm is not sufficient for an injunction to issue in favor of a bid protestor. *See* Def.'s Mot. at 23 (citing *Monsanto Co. v. Geertson Seed Farms,* —— U.S. ——, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010); *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). The court need not decide this issue, because HP has shown that it will suffer both monetary harm and non-monetary harm that would be irreparable if an injunction does not issue in this instance.[13]

▮ HP argues that it would suffer five types of irreparable harm: loss of the opportunity to fairly compete for the bridge contract; loss of profits from the bridge contract (because it would otherwise have been awarded the contract as lowest price technically acceptable bidder); loss of key employees; loss of competitive advantage in the follow-on procurement; and, disruption of overseas operations if HP must reassign employees as a result of the bridge contract award. Pl.'s Mot. for Prelim. Inj. at 32–35; Pl.'s Mot. at 28–31. Although defendant argues that these harms are too speculative to constitute irreparable harm, the court disagrees. The court considers the monetary and non-monetary harms to the incumbent contractor HP, in the circumstances of this procurement for services to be performed at locations throughout Europe, to be irreparable. Thus, the second factor for receiving a permanent injunction favors plaintiff.

As to the balance of hardships, the harm to the government has not been shown to be particularly onerous. According to defendant, an injunction of the contract award to L–3 would force the Air Force to continue to

---

13. To the court's knowledge, there is no binding precedent from the Federal Circuit which addresses defendant's argument. The majority view in this court appears to be that the econom-

ic harm suffered from the loss of an opportunity to fairly compete for a government contract constitutes, in many if not most cases, irreparable harm. *See* Pl.'s Mot. at 28–29 (citing cases).

obtain services from HP for some time. Def.'s Mot. at 27–28. There is no showing, however, that the purchase of these services would cause harm to the government that would outweigh the harm that HP would suffer absent an injunction. Therefore, this factor, too, is in favor of HP's request for injunctive relief.

Finally, the court finds that the public interest is best served by enjoining the award to L–3. The Agency's award decision relied on an eligibility criterion not communicated to offerors, and irrationally relied on the GSA Ordering Guidelines. Furthermore, HP provided the proposal with the lowest price, yet the Air Force rejected those cost savings. Such award decisions destroy the public trust in government contracting and deprive the government of the benefits of full and open competition. *See, e.g., Metcalf Constr. Co. v. United States*, 53 Fed.Cl. 617, 645 (2002) (noting the twin goals of preserving "public confidence and competition in the federal procurement process") (citation omitted). Because all four factors favor injunctive relief in this protest, the award to L–3 must be overturned.

### CONCLUSION

Because the elimination of HP's proposal from this competition was arbitrary and contrary to law, the award of the task order to L–3 must be set aside. The Air Force may review the proposals before it and award to the lowest price technically acceptable offeror, or take any other action consistent with procurement law and this decision.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Judgment on the Administrative Record, filed January 20, 2012, is **GRANTED;**

(2) Defendant's Motion to Dismiss, or, in the Alternative, for Judgment on the Administrative Record, filed February 3, 2012, is **DENIED;**

(3) Plaintiff's Request for a Permanent Injunction, filed as part of its Motion for Judgment on the Administrative Record on January 20, 2012, is **GRANTED** as follows:

The United States, by and through the Department of the Air Force, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from obtaining performance from L–3 Services, Inc. on **Contract No. FA5613–11–F–8091** awarded on September 1, 2011; further, any re-evaluation of proposals received under **Solicitation No. FA5613–11–R–0009** shall be performed in accordance with the interpretation of the solicitation provided in this opinion;

(4) The Clerk's Office is directed to **ENTER** final judgment in favor of plaintiff;

(5) On or before **March 30, 2012,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(6) Each party shall bear its own costs.